

RCOLEMAN@DHILLONLAW.COM
ADMITTED IN NEW JERSEY AND NEW YORK

November 30, 2020

**BY EMAIL**

The President
The White House
1600 Pennsylvania Avenue
Washington, DC  20500

The Honorable William Barr
Attorney General
United States Department of Justice
950 Pennsylvania Avenue N.W.
Washington, DC  20530

Re:   **Pardon application of Ari Teman**
      **U.S. v. Teman (S.D.N.Y. 1:19-cr-00696)**

Mr. President and Attorney General Barr:

    I am a lawyer who has been active in the practice of Internet-related law, including issues concerning the formation of contracts and, in particular, the law relating to unfair and deceptive trade practices relating to the Internet for decades.  I have lectured and written extensively on these subjects,  and I write today to join with the esteemed legal authorities and figures, including Prof. Alan Dershowitz, Prof. Lawrence Lessig and outstanding attorneys such as Molly McCann (General Flynn's attorney), David Markus, Pat Nolan, Kurt Schlichter, Robert Barnes, David Safavian, and others – all of whom, like me, have made themselves available *pro bono publico* concerning this cause – in urging a full pardon for Mr. Ari Teman, the defendant in the referenced criminal matter.  Although I am using my professional letterhead in this instance because I am writing as a lawyer, Mr. Teman is not a

November 30, 2020
Page 2 of 5

client of our firm and has never been one. Moreover, I speak only for myself, albeit professionally, in this letter. I explain my reasoning below.

The President and Attorney General will doubtless be aware of correspondence received concerning Mr. Teman's case that addresses extensive claims of prosecutorial misconduct. I am neither familiar enough with the record nor qualified by experience or otherwise to offer an opinion concerning these matters; nor would I presume to address them in a pardon application given the procedural posture of the defendant at this time. I do, however, have the experience to address the very narrow issue of whether the criminal offense with which Mr. Teman was charged and convicted should properly be considered criminal, or even deceptive, at all.

Mr. Teman was essentially convicted on the basis of what is commonly called a "click-wrap" contract, meaning the web-based terms that an Internet business – in this case, Mr. Teman's company, GateGuard – uploads and requires users to agree to before offering a product or service. It is well established that such online contracts are, under virtually all circumstances, proper and enforceable, and that their terms govern the seller's relationship with its customers. The Government's theory of criminal liability was that the structure of GateGuard's online terms was evidence of an "intent to defraud" its customers, however. Ultimately, the District Court ruled that the jury could have reasonably convicted Teman of fraud because GateGuard's terms included hyperlinks to subpages, requiring them to follow those links in order to be fully apprised of the terms to which they were agreeing to be subject in their relationships with GateGuard. The premise of this ruling appears to be that the use of hyperlinks, as opposed to cutting and pasting text and information into the terms found online on one webpage, constituted a sort of deception.

With all due respect to the District Court judge, I write to urge that such an interpretation of the custom and practice utilized throughout the world of Internet commerce is incomprehensible. Certainly, there is no question that virtually all contemporary businesses utilize online contracts to offer their services to the public and subsequently to document the terms under which their customer relationships will continue to proceed. And it is beyond question that the practice of using hyperlinks to extend, elucidate or otherwise incorporate online contractual terms in e-commerce websites, using subpages and hyperlinks, is widespread and uncontroversial. Organizing terms and related information in this way benefits businesses and customers alike, allowing all parties access and reference to them, and the ability to update specific sections of the terms, when necessary and appropriate. There is no obvious or even rationale for claiming that it is deceptive or fraudulent for Internet-based customers, who are at this point in technology history intimately familiar with how the Internet works, to click a clearly-highlighted hyperlink to obtain information. Indeed, it can be argued that doing so is far more convenient, and makes the information more accessible, than repetitive scrolls down a massive screen jammed with

November 30, 2020
Page 3 of 5

verbiage. That is why the practice of using hyperlinks and subpages for contract terms is employed by companies such as Amazon, Google and Netflix.

Notably, GateGuard's terms are effectively identical in form and substance to those used by another national company Airbnb**,** a recognized leader in the same industry (property management) in which GateGuard operates. This should come as no surprise, because it is common practice among web designers and legal counsel advising new online businesses to recommend that new businesses "borrow" such terms where available online content in setting up their own e-commerce sites. The advantage of doing so are obvious: Similar businesses that are already successful in the same market have typically customized their terms of service to that market based on commercial experience, and are presumptively acceptable to regulators given the high profile and success of such market leaders. Despite the fact that the Government repeatedly emphasized the format and structure of GateGuard's terms as evidence of Teman's guilt during trial, I am aware of no claim by either criminal or regulatory authorities that the virtually identical terms and structure used by Airbnb are problematic, much less felonious. In fact,

The case law is clear that online contract terms that incorporate content via sub-pages and hyperlinks are legal and binding. I am also advised that testimony at trial by customers of GateGuard established that these consumers themselves were aware of this fact and that all the information needed to understand the applicable terms of service were no more than a click or two away at any time of the day or night. It is not necessary for consumers to actually click such supplementary links in order for them to enforceable parts of the contract between them and the online merchant. Thus, for example, in *Meyer v Kalanick (Uber),* the Second Circuit ruled that plain text disclosure of terms being applicable were binding whether or not the user clicked the link – just as a consumer, given the opportunity to read a long paper contract, has the discretion to go through each word on each page or not. Indeed, as Professor Lessig, the preeminent internet law expert, has attested in his letter to you, GateGuard's online terms are relatively concise compared to many common and unquestionably enforceable online terms.

The argument that consumers, much less business entities, are defrauded when they choose not to click a hyperlink to read a contract subpage turns generations of contract law as well as basic principles concerning fraud in the inducement of a contract on their heads. Even in the consumer context, fraud requires that the non-disclosing party not have a reasonable opportunity to obtain information by virtue of non-disclosure by the party against whom fraud is claimed – a situation that simply does not apply when full disclosure is available by clicking on a hyperlink. This obligation on the buyer to do a minimum of diligence on its own behalf applies even more powerfully in a commercial context such as the one in question here. Such "B to B" (business to business) online users can and should reasonably be expected by the law to not only review a prospective contract in depth but to have their legal representatives do so before entering into a contract of substantial value. For this

November 30, 2020
Page 4 of 5

reason, in *GateGuard, Inc. v. MVI Systems LLC*, (1:19-cv-02472) (S.D.N.Y. 2019), the Southern District upheld the GateGuard arbitration clause – found on the Dispute Terms subpage of GateGuard's Terms.

It is difficult indeed to understand how both this straightforward legal standard and testimony that GateGuard's customers not only should have, but did know the terms of their contracts with GateGuard before they agreed to them, could have been disregarded by the court and the jury at Mr. Teman's trial. I have learned that two of the three entities involved were, according to unrebutted testimony, shown not only to have read the first page of the terms in depth, but that they copy-pasted the paragraph referencing the Payment Terms into emails to Mr. Teman in order to ask him questions about those terms **before** they agreed to them! The third entity not only discussed the exclusivity and non-compete segments, moreover, but even emailed GateGuard's attorney asking for "a release" from certain terms. Under these circumstances, Mr. Teman was quite justified in understanding that the GateGuard terms were legal, binding and enforceable, and that taking action to enforce those terms could not amount to a criminal *mens rea* on the part of Mr. Teman. (As Professor Lessig points out, the high fees make sense, because these clients owed the majority of multi-year agreements and also incurred collections penalties, as are standard with equipment and service financing agreements.)

That Mr. Teman lacked criminal *mens rea* appears irrefutable, moreover, because as would be expected, Mr. Teman did not structure his company's terms, his company's law firm did – and, again, those terms were based on Airbnb's, which also faces the issue of illegal sublets, which is potentially devastating to its business. I am also informed, however, that this "structuring" theory of criminal liability was essentially sprung on the defense by the government at closing argument and post-trial motions, thus depriving Mr. Teman of the opportunity to rebut it by testimony and documentation proving that his attorneys who emailed him the terms, discussed how they were structured online in the same way as Airbnb's, and establish for the jury that in publishing those terms in that format Mr. Teman was relying on counsel – which, under *United States v. Scully*, would at least have required a jury instruction regarding the government's burden of proof concerning intent, a necessary component for a conviction on charges of wire fraud and bank fraud. 877 F.3d 464 (2d Cir. 2017). For the district court to have, instead, permitted the government's to rely on its "structuring" claim as a basis for the jury to find criminal intent was a miscarriage of justice.

I did not know Mr. Teman until he approached me, because of my background in this area of law, concerning his conviction. I agreed to assist him without charge or consideration in part because, from the point of view of e-commerce clients I represent, the conviction of Mr. Teman for fraud on the basis of his company's online terms creates a real danger for online businesses and their executives that is not justified by statute and which threatens all e-commerce enterprises. While contractual disputes between customers and online sellers are inevitable, they are properly addressed in **civil** proceedings except for the most egregious and

November 30, 2020
Page 5 of 5

impactful criminal conduct. That is not what happened here, and the criminal conviction of Ari Teman for the use and reliance on widely-used contract terms and business practices is deeply troubling and a threat both to online commerce but fundamental notions of justice and personal liberty.

    I am very grateful for your consideration concerning these remarks and, again, respectfully urge that Mr. Teman receive a pardon and that the Department of Justice issue appropriate guidance to prosecutors regarding criminal prosecutions of this nature.

    Most respectfully,

    Ronald D. Coleman